## 𝔕𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

### HURT & SON v. MYERS AND AXTELL, RECEIVERS.

#### APRIL 21st, 1887.

CONSTRUCTION OF STATUTES—*Contracts*—*Water rates.*—The property and franchises of the James River and Kanawha Canal Co. were purchased under an act approved February 27th, 1879, by the R. & A. Railroad Co. This act directs that all then existing leases of water privileges along the line of the canal, "shall be respected and maintained at rates not exceeding the present rates." The lessees contended that this act perpetuates, at their option, all leases of water privileges existing at its passage—

HELD :

> This act does not forbid the company to increase the water rates, except only where to do so would violate " *existing* contracts."

Appeal from decree of circuit court of city of Richmond, entered November 7th, 1885, in the suits in chancery therein pending, by the style of Green and Bocock, trustees, against the Richmond & Alleghany R. R. Company, and Alexander & Ellerson, trustees, &c., against the Same. By a previous decree in said causes, Lawrence Myers and Decatur Axtell had been appointed receivers of the said company, and this contention is between them and Stephen C. Hurt and Wm. Hurt, partners in business under the style of S. C. Hurt & Son, who appealed from the decree of November 7th, 1885. Opinion states the case.

*Kean & Kean,* for the appellants.

This case turns on the construction of the sixth clause of the first section of the Act approved twenty-seventh

February, 1879, (Acts 1878-9, ch. 139, p. 118 *et seq*.) For this clause, see opinion of Lewis, P.

The contracts for water privileges on the Lynchburg level ran to first July, 1883, (pp. 16 and 17). The appellants and others interested in this appeal are users of water power from the Lynchburg level.

The *rates* current on the Lynchburg level, under the contracts running to first July, 1883, were seventy cents a unit per annum for use the whole twenty-four hours, (p. 117.)

A unit is one cubic foot of water per second per foot of head and fall, (pp. 31 and 117.)

The terms and conditions of contracts current to first July, 1883, are set out at pp. 18–22.

The terms and conditions sought to be imposed are set out in the "Application for water power" (pp. 31–34), a paper prepared in blank by the Richmond and Alleghany Railroad Company, and required to be filled up, signed and delivered by persons desiring to use water, as a condition precedent to a formal contract.

The appellants claim that the language of this sixth clause gives the same effect to leases current on the date of the transfer of the property of the James River and Kanawha Company to the Richmond and Alleghany Railroad Company, as if these leases had contained a covenant of perpetual renewal, at the option of the lessee, on the same terms and conditions, except that the rate was subject to agreement, but in no case to exceed the then current rate, which was established as a perpetual maximum.

The contention of the appellees is, that this provision of the sixth clause was intended *solely* for the protection of the current leases of the James River and Kanawha Company up to the period of the expiration by their terms, and that now the water power is, to use the expression of the Richmond and Alleghany Railroad Company, "a com-

modity that it has for sale" (p. 84), and that "it has the unrestricted right, for the present and future, to charge for its water, as against the plaintiffs, whatever sum it may see fit to charge. It is simply a matter for treaty and contract between the parties," (p. 96).

It will be seen that the question between these two constructions is one of great, of vital importance to users of water power from the canal. Rates and conditions of future leases—perhaps the financial existence of some enterprises—depend on the conclusion.

We therefore ask the careful consideration of the following reasons, which we think show conclusively that the claim and contention of the appellants, users of water power, ought to be sustained.

*The Lessees of Water Power needed no protection for the Unexpired Terms of Leases current at the transfer from the James River and Kanawha Company to the Richmond and Alleghany Railroad Company.*

(*a*) These leases were contracts, and even a direct attempt to affect them on the part of the legislature would have been void, as impairing their obligation. No power known to our institutions could have altered them without the consent of the parties. No power save the exercise of the right of eminent domain could have extinguished them *in invitum,* and then compensation must have been made.

(*b*) These leases created *easements,* which were open and notorious, and to these easements the property of the James River and Kanawha Company was subject, during the time for which they had been granted, into whose hands soever it came. These leases were covenants, and by operation of law these covenants ran with the property of the James River and Kanawha Company, binding each owner for the time being during the continuance of the

leases. These covenants also ran with the water privilege, binding all subsequent assigns during the continuance of the leases. This was an operation of law incident to each of these contracts when made, and so becoming a part of it, and putting it out of the power of the legislature to release either the James River and Kanawha Company and its successors and assigns from the obligation to furnish water, or the lessees and their assigns from the duty to pay rent.

That a water privilege is an easement, or, when of indefinite duration, an incorporeal hereditament, see *Sterling Hydraulic Co.* v. *Williams* (66 Ill. 393), citing Angell & Ames on Water-courses, § 144. *Mandebach* v. *Bethany Orphan's Home*, 2 Eastern Reporter, 477, (s. c. State of Pa.,) decided twenty-fifth October, 1885.

That covenants creating easements or incorporeal hereditaments will run with the servient tenement, binding subsequent holders, see *Brewster* v. *Kitchell*, 12 Mod. 166; *Martin* v. *Williams*, 1 Hurlstone & Norman, 817; *Holmes* v. *Buckley*, 1 Equity Cases Abridged, 27; *Norfleet* v. *Cromwell*, 64 N. C. 1; and therefore any transferee of the James River and Kanawha Company was bound by these leases as completely as that Company, and entitled to the rents payable by the lessees.

That covenants will run with incorporeal hereditament, see *Sterling Hydraulic Co.* v. *Williams*, 66 Ill. 393; *Norfleet* v. *Cromwell*, 64 N. C. 1; *Bally* v. *Wells*, 3 Wilson, 25; *Brewster* v. *Kitchell*, 12 Mod. 166; therefore the lessees and their assigns were bound to pay the rents and entitled to the use of the water.

This case is almost the exact parallel of *Holmes* v. *Buckley* and *Norfleet* v. *Cromwell*. Here, as in those cases, there is both benefit and burden on each side, and the covenant runs as to both benefit and burden to assignees of both grantor and grantee—lessor and lessee. On the part of the

grantor there is the benefit of the rents received and the burden of the water to be furnished. On the part of the grantees there is the benefit of the water received and the burden of the rents to be paid. The case seems to us to be beyond question on this point.

(c) But if we are mistaken in our view that the leases are covenants running with the land and the water privilege, and binding assigns of both grantor and grantee, then the only other alternative for the appellees is that these leases are grants of water power. Being grants, the lessees are purchasers for value of so much water in actual possession at the time of the transfer of the property of the James River and Kanawha Company to the Richmond and Alleghany Railroad Company. Being such purchasers, in actual possession, *sub modo*, the transfer could only have been made subject to their rights for the reasons set out in (a) above. In such case any taking of the property in this water power, whether by direct provision of a statute, or indirectly under authority of a statute, would be a taking without "due process of law," and both the act, and what should be done under it would be void. *Millet* v. *People*, 15 Am. and Eng. Corpn. Cas. 1 (Ill. sixth June, 1886.)

In no event and under no theory could the legislature give to or take from these fragments of leases one jot or tittle of force, effect or virtue. They passed to their holders property, which these lessees held as sacredly and as securely as any species of property is held by any private citizen—protected alike by the State and federal constitutions.

*The Unexpired Terms of Current Water Leases were fully protected by Section 1, Clause 1 of the Enabling Act.*

Even if there could be any doubt of the soundness of the first proposition, and we think there can be none, the

unexpired fragments of current contracts find full and complete protection elsewhere in the enabling act than in the sixth clause.

The fourth element of the consideration was "the assumpton and payment of all debts and obligations of the James River and Kanawha Company."

It cannot be denied that these contracts for water privileges under its corporate seal were obligations of the James River and Kanawha Company in the most technical sense of the term. As such obligations the Richmond and Alleghany Railroad Company assumed them and became as completely bound as was its predecessor. Having assumed these contracts by accepting the property under the act, which is set out at large in the deed of conveyance, the Richmond and Alleghany Railroad Company was bound by every term and condition, and was as devoid of power to alter the rate as to alter any other condition. This is the necessary effect of the language "assumption and payment of all the debts and obligations." The "payment of the debts" and "assumption of the obligations" other than to pay money. The requirement to pay debts renders the requirement to *assume* superfluous and useless unless the word "obligations" applies to duties other than the payment of money. Payment of a debt includes the idea of assumption.

This requirement renders any reference in the sixth clause to these unexpired leases tautologous and unnecessary. It cannot be possible that the same thing would twice enter as an element of "consideration to be paid and rendered," first as a part of the duties to be performed under the sixth clause, and then, after a semicolon, again under the "assumption and payment of all the debts and obligations" of the old company.

Such a construction is manifestly absurd.

These leases are included in the words "assumption and

payment of all the debts and obligations of the James River and Kanawha Company," and the language of the sixth clause was never intended to apply 'til the expiration of current contracts.

### *Protection needed after expiration of current leases.*

The holders of these leases had invested many thousands of dollars in plants, buildings and machinery, which, without a continued supply of water, would be almost or quite valueless. *These investments did need protection after the expiration of the current leases.*

The State of Virginia owned 104,000 out of 124,000 shares of stock in the James River and Kanawha Company. She, through the board of public works, appointed four out of seven directors, and in the election of president and two out of the other three directors, her proxies voted three-fifths of the capital stock votes. The stockholders, other than the State, elected *one director.* The prime object of the James River and Kanawha Company was navigation. For these reasons an absolute right of renewal could not be granted lessees, because the time might have come when all the water would be needed for navigation. The lessees, at the same time, had no ground for apprehension, because the supply of water was obliged to be kept up and the affairs of the company were administered by a body without personal interests and practically judicial. The change by the contemplated sale from canal to railroad would have left these lessees at the mercy of a company in which the State had no interest and retained no voice. A company to which the maintenance of the water supply was not a necessity. The interest of the old James River and Kanawha Company in the premises, owned and controlled as it was, was an established and well-understood thing, and experience had shown that it could be trusted without ad-

ditional safeguards for the protection of the lessees.    The interest of the railroad company (of any railroad company) is an occult, tangible thing, depending on the outside invest- ments of the persons, for the time being, controlling a majority of the stock.    Experience generally has shown that it *cannot* be trusted.    Experience in this particular instance is corroborative.

This company did not lose a moment in its endeavor to lay the hand of confiscation on private enterprises along its line dependent on it for water power.    As its first move, it proposed to more than double the water rents, raising them from seventy cents to two dollars per unit (p. 77).    Afterwards this demand was modified, and the pro- posal was only to raise them from seventy cents to one dollar and a half a unit, but as a condition of this liberal "proposal," it further proposed to make the leases renewa- ble forever at periods of ten years, "provided, however, that upon the expiration of any of these terms of ten years the lessor shall have the option, instead of renewing the lease, to take the land, buildings, and improvements using water under the lease, at a fair valuation, such valuation to be fixed, if the parties cannot agree, by referees appointed in the usual manner," (p. 31.)

This effort to more than double the water rents is only another name for the effort to secure an abnormal share of the supposed profits of the business.    Of what value is the specious proposal for "a fair valuation" by "referees," when the property has been saddled with a burden in the form of exhorbitant water rents that the business will not bear?

With these large investments of her citizens, dependent on a great work of public improvement, in which more than ten millions of public money had been expended, and with this inducement to protect the investments of her citi- zens, made originally in the faith of her protection, as the

controlling owner of the works on which they were dependent, the State *gave* the canal and franchises to the Richmond and Alleghany Railroad Company upon conditions.

### *It was reasonable that these Leases should be protected after the expiration of current Leases.*

We find from section one, clause one, of the act above referred to, that the "consideration to be paid and rendered" by the Richmond and Alleghany Railroad Company was:

(*a*) The maintenance of the canal as a line of commerce till the railroad should be finished.

(*b*) The building and equipping of a first-class railroad.

(*c*) "The performance of the duties prescribed by the sixth clause of this first section."

(*d*) The assumption and payment of the debts and obligations of the James River and Kanawha Company.

The property acquired for the above consideration had cost over twelve millions, more than ten of which was public money; and there were outstanding against it less than two millions of indebtedness. This property in the main consisted of the docks at Richmond, the canal with towing path, aqueducts, etc., etc., making the finest road-bed on the continent, and having masonry unsurpassed in the world.

Let us analyze the price paid for this magnificent and costly work:

(*a*) The maintenance of the canal could not have been a very serious burden, as it could not continue by the act more than two years, and at the same time yielded tolls and furnished the railroad company transportation facilities while building the road. This item cannot be put at very high figures as consideration paid and rendered.

(*b*) The building and equipping a railroad was the very object of the being of the Richmond and Alleghany Railroad Company. That it should be a first-class railroad cannot surely be claimed as a large item in the consideration paid and rendered. That it should be equipped with " ample accommodation for passenger travel and freight transportation" one would suppose not outside the intention of any newly organized railroad company. Of the good faith with which this item of consideration was actually paid and rendered, we have rather a striking instance in the " Car Trusts," which appear in this record,

(*d*) The assumption and payment of the debts and obligations of the James River and Kanawha Company. The schedule attached to the deed of fourth March, 1880, puts these debts at a grand total of $1,839,262.18. The enabling act was passed twenty-seventh February, 1879. This act required the transfer to be consummated within one hundred and twenty days (p. 67, § 2). The time passed without the transfer. The new act reviving and re-entering the former was approved on the fourth of March, 1880, and the deed bears date the same day. The transfer was actually made fourth March, 1880. Who can tell what proportion of $1,839,262.18 was, during the intervening year, bought in at a discount, or what that discount was? Even at par it is a very modest contribution to the purchase price of property costing more than six times that sum.

The obligations assumed were not burdensome—they are not scheduled.

(*c*) " The performance of the duties prescribed by the sixth clause of this first section."

This seems really, so far as the rendition by the Richmond and Alleghany Railroad Company is concerned, to have constituted the most important element of the consideration. All the duties of this sixth clause are admitted to be perpetual, save that covered by the words, "all existing

contracts for water privileges along the entire line shall be respected and maintained at rates not exceeding the present rates." If this was intended to protect the fragments of three years unexpired out of fifteen-year leases, already abundantly secure, why should it be made a duty, along with perpetuities, as a part of the " consideration to be paid and rendered ? " If this temporary effect was intended, it was unworthy the dignity of being classed as a duty constituting part of the most important element of the consideration for this great work and property. If only these fragments of leases were intended to be protected, their protection would have been made, not a duty with other perpetuities, but a mere *condition,* as well as the observance of the contract obligations of the James River and Kanawha Company in other respects. Let us examine the things made *conditions* and not considered of sufficient dignity to be reckoned as part of the " consideration to be paid and rendered." We find :

1. The maintenance of the farm bridges, which, while acknowledged to be perpetual, is not a part of the consideration. (Cl. 7, p. 63.)

2. The keeping open of necessary ditches. (Cl. 7, p. 63.)

3. The maximum limit fixed for tolls for navigation, and the limitation of the rights to charge them to the completion of the railroad. (Cl. 12 and 13, p. 65.)

4. Payment provided to be made for boats rendered useless by the abandonment of the canal. (Cl. 14, p. 65.)

5. Requirement to furnish facilities for crossing communities on the south side of the river. This is obviously perpetual. (Cl. 16, p. 66.)

6. Requirement to provide and keep in repair fish-ways at all dams not broken. This, too, is obviously perpetual. (Cl. 16, p. 66.)

All or any of these are matters of as much importance as the unexpired fragments of leases, in some cases of more

importance, yet none nor all of them together are as important as a perpetual supply of water on guaranteed terms and within a guaranteed maximum rate.

When we come to examine the text of the sixth clause, we shall see that it prescribes seven duties to be performed. Six of these duties are confessedly perpetual, and yet the practical value and benefit of four out of the six is, as we shall see, absolutely dependent on the perpetuity of the seventh, which is denied. As a practical question, this would reduce the duties to two and remove the bulk of this element of the "consideration." We say, therefore, that from all the surrounding circumstances, it was in the highest degree reasonable and proper that this protection should be extended to these lessees *after the expiration of current leases.* It is the only element of the consideration that moves for the benefit of a large and widespread class of the citizens whose money had built the canal and works about to pass from public to private control.

### *The Sixth Clause examined by itself.*

The examination of the sixth clause by itself shows clearly that the legislature intended this protection of lessees of water power, by a maximum of rates and fixing of terms, to be perpetual.

(*a*) Every other duty prescribed in the sixth clause is perpetual and admitted so to be. It is unreasonable and strained to suppose that the legislature would interject and interweave so temporary and evanescent a thing as the unexpired three years of a fifteen-year lease into a clause establishing perpetuities. It is unnatural for any mind, filled with the idea of framing provisions to last for all time, to pause between commas to put in a provision to last for only three years.

The provisions of this sixth clause are:

1. The establishment of the present rate of dockage as a perpetual maximum.

2. That "all existing contracts for water privileges along the entire line shall be respected and maintained at rates not exceeding the present rates."

3. The maintenance of the present water supply of the docks.

4. The maintenance of the present water supply of the canal along its line from Bosher's dam to the tide water.

5. The maintenance of the present water supply of the canal along its line, along the Lynchburg level from the water works dam above Lynchburg to the first lock below Lynchburg.

6. That the railroad company shall not destroy or obstruct, so as to lessen the present water supply, the present canal between Bosher's dam and tide water, or

7. Between the water works dam above Lynchburg and the first lock below Lynchburg.

The bulk of the "contracts for water privileges" are at Lynchburg and Richmond. At these two cities the great manufacturing establishments have hundreds of thousands of dollars invested. However it may be at Richmond, at Lynchburg there is not a single *public* enterprise of any sort drawing water power from that level. It follows that private enterprises were in the mind of the legislature when it required the supply of water on that level to be kept up and forbade it to be diminished. To the real protection of these investments, five of the seven duties of this sixth clause relate.

The first duty is the maximum limit of dockage. The third requires the continuance of the present supply of water for the docks. All the rest are for the protection of the establishments dependent on the canal for water power. The last four provide for the perpetual supply of water undiminished. The second provides for the continuation

of current contracts on the same terms and at rates "not exceeding the present rates." If this were not so, the perpetuation of the supply of water would be without motive and an idle mockery. The last four duties constitute a guaranty that the second shall not be valueless. Without the second the last four would be valueless. If the contention of the appellee is right, what good can the perpetuation of the supply of water unobstructed do these investments? If the railroad company can charge any individual any price it pleases, what sense is there in the requirement to perpetually maintain the water supply? We have shown how completely unbridled license, in the power to fix rates, puts these investments at the mercy of this company. Is it to be supposed that the legislature had no meaning in requiring the full and unobstructed supply of water to be maintained? It will hardly be contended that the performance of these duties was intended as a protection and benefit to the railroad company. That company could safely be trusted to take care of its own interests in the premises. It was *another* interest, possibly adverse to the views of the railroad company, that the law was taking care of and protecting, *because the company's interest, or those of its managers, might be adverse to it.* Is it possible that a construction will be given to this clause that will make that meaning of the legislature nugatory? This is beyond question the effect of the construction sought to be imposed by the appellees. How completely are these investments and their owners in the hands of the Richmond and Alleghany Railroad Company, if it is allowed to have, as it claims, "the unrestricted right, for the present and future, to charge for its water, as against the plaintiffs, whatever sum it may see fit to charge;" if, as is claimed, "it is simply a matter for treaty and contract between the parties." Surely the next step will be to claim the "unrestricted right" to "treat" or not as may suit the purposes

of the managers of the railroad company. Such a construction gives to the railroad company practical absolution from the performance of five of the seven "duties prescribed by the sixth clause of this first section." It may, under the construction of the appellees, arbitrarily and absolutely refuse to let out an ounce of water, in which case there would be nobody interested to enforce the "performance" of the last four duties, and so they be altogether pretermitted. Or it may refuse to contract, except on conditions wholly relieving it from the performance of these duties. It has already, as we have seen, made the giving of an "option" on the property using water one of the essential conditions on which alone it will "treat."

A construction that gives this company the "unrestricted right" to perform or not, as it pleases, five of the seven "duties prescribed" as an integral part of the "consideration to be paid and rendered," cannot be the intention of the legislature. We are satisfied that this court will not sanction such emasculation of an act of assembly.

(b) Again, the *language* of the sixth clause makes the construction we claim for it the only proper one: "All existing contracts for water privileges along the entire line shall be respected and maintained at rates not exceeding the present rates, except in those cases in which they may be cancelled, or altered by agreement or extinguished by condemnation."

The rule is that that construction must be adopted which gives some effect to each and every word. "Every part of the writing must be made, if possible, to take effect, and every word of it must be made to operate in some shape or other." Staples, J., for the whole court in *Tate* v. *Tate's Ex'or*, 75 Va. 527.

If the appellees are right, all of this sentence after the word *"respected"* is insignificant tautology. If the view held by the circuit court of the city of Richmond is cor-

rect, not only is the act tautologous, but the whole of the language above quoted is unnecessary and cumulative as merely declaratory of rights already existing and perfectly secure.    Four lines, out of seventeen, prescribing duties, the performance of which constitute the most important element of "consideration," are of no more effect than if they had been wholly omitted.

If only the fragments of current contracts are had in view here, what can possibly be the meaning of maintaining them at *"rates not exceeding the present rates?"*    The very rates themselves of the current contracts are *absolutely fixed by the contracts.*

It is confidently submitted that "rates" not exceeding the "present rates," can only be rates that *come after* the present rates, and that "the present rates" can only be the rates of existing contracts throughout the full time for which they were made.

We have shown that the "existing contracts" were impregnable even against the assault of the legislature itself. To provide that they should be "respected," meaning for the residue of the period they ran by their terms, would have been useless though declaratory of the legal effect of these contracts.    To provide that they, meaning the "existing contracts" for their unexpired terms, should be "maintained at rates not exceeding the present rates," was absured and contradictory of what had just preceded. Respecting the unexpired fragment of current leases involves necessarily the observance of the "rate" thereby fixed.    Nobody standing in the shoes of the lessor could "respect" that contract and change the rate, even if the power to do so existed.    We do not consider any change assented to by the lessee, because that takes the case at once out of the statute.    *"Modus et conventio vincunt legem."*

*The Sixth Clause examined with the rest of the Act.*

A careful examination of the enabling act shows that everything mentioned in it, by its nature capable of being made a perpetual duty, is so made.

The legislature was careful to perpetuate those things that the James River and Kanawha Company would, from its nature, have continued indefinitely. The legislature was thus providing that as a return for the property, having cost so much of public treasure, as many of the citizens as possible should be protected in the enjoyment of facilities the former company would not have disturbed.

Reading the act carefully as we can, we find the following to be all the duties capable of being made perpetual:

(*a*) The maximum rate of dockage. (Cl. 6.)

(*b*) The duty that "all existing contracts for water privileges along the entire line shall be respected and maintained at rates not exceeding the present rates." (Cl. 6.)

(*c*) The maintenance of the water supply of the docks. (Cl. 6.)

(*d*) The maintenance of the supply of water at Richmond. (Cl. 6.)

(*e*) The maintenance of the supply of water at Lynchburg. (Cl. 6.)

(*f*) The duty not to destroy or obstruct the present canal at Richmond. (Cl. 6.)

(*g*) The duty not to destroy or obstruct the present canal at Lynchburg. (Cl. 6.)

(*h*) The maintenance of farm bridges. (Cl. 7.)

(*i*) The keeping open necessary ditches. (Cl. 7.)

(*j*) The duty to make bridges or fills where the streets of any town cross the canal and keep the same in repair. (Cl. 7.)

(*k*) The proviso that after the railroad is completed the company shall not charge tolls for navigation, but may

charge rents for water power as now provided by law. (Cl. 12.)

(*l*) The duty to furnish facilities for crossing, equal to those furnished by James River and Kanawha Company, to the people on the south side of the James river. (Cl. 15.)

(*m*) The duty to build and keep in repair fish ladders at all dams. (Cl. 16.)

(*n*) The duty to drain the canal bed as fast as it is abandoned. (Section 7.)

Here then are fourteen things required to be done by the Richmond and Alleghany Railroad Company, each of them in its nature capable of being made a perpetual duty. As to thirteen of them, there is no question that the obligation of observance is perpetual. The only question raised is as to the second (*b*) above. There is no other thing required to be done by this company, that is in its nature capable of perpetuity, save these fourteen. Can any sound reason be conceived why thirteen of these should be perpetual and the other not?

Several of these things are matters of very great importance to persons along the line, as the maintenance of farm bridges, the furnishing facilities for crossing the river to persons on the south side. These are protected by simple provisos. The obligation that "all existing contracts for water privileges shall be respected and maintained at rates not exceeding the present rates," is not only erected into an important element of the "consideration to be paid and rendered," but is also in the seventh clause so far further exalted, along with the other duties of clause six, that the "performance" of these seven "duties" shall be the only *continuing* thing to be done by the Richmond and Allegany Railroad Company as "*a sufficient compliance with all the conditions on which the franchises of the James River and Kanawha Company were heretofore granted to it by the State of Virginia*," and yet we are

told that this sixth clause is to be so construed that one-fourth of it in quantity—four out of seventeen lines—devoted to the description of one out of seven duties, is tautologous surplusage. That this sixth clause is to be so construed that five of the seven duties considered by the legislature of such high import are to be left to the caprice of this company with the "unrestricted right" to do as it pleases in the discharge of them. That this company is to have the "unrestricted right" to do as it pleases, because it has the "unrestricted" power, if the circuit court of Richmond is sustained. And this, too, in the discharge of five out of seven duties described in a clause of seventeen lines whereof less than five are devoted to the description of the two duties and more than twelve lines to the other five. These duties are nowhere separated in the act. No distinction is drawn between them. Whenever mentioned they are described as ".the duties prescribed by the sixth clause." They all really stand on the same footing. They all together constitute part of the "consideration" for property that cost millions.

The whole act shows the solicitude of the legislature to secure for the people of the State, or as many of them as possible, some substantial benefit by way of consideration for, or condition on, which this public work was turned over to this company.

The act throughout, and especially in this sixth clause, shows an anxious purpose on the part of the legislature to *protect all existing interests* against the contingencies incident to the change of ownership of the canal property, down to the old boats, salaries, wages, and attorneys' fees.

### The Claim of the Appellees Examined.

The extent of the claim set up by the Richmond and Alleghany Railroad and the other appellees, at once de-

monstrates the imperious necessity for the protection we claim under the sixth clause, and the impropriety of the construction given by the circuit court of the city of Richmond.

Referring to the record, page 96, (page 60 of "Exhibit XX"), we see that the Richmond and Alleghany Railroad Company claims for itself the absolute and arbitrary power of confiscation of every dollar invested in improvements dependent for water supply on the works of the James River and Kanawha Company for more than two hundred miles along James river. To use its own language, it claims that the sixth clause must be so construed "that it has the unrestricted right, for the present and future, to charge for its water, as against the plaintiffs, whatever sum it may see fit to charge. It is simply a matter for treaty and contract between the parties." This claim covers not only the "unrestricted right to charge what it may see fit to charge," but also to lay any conditions it may see fit to lay, upon the use of water. If its prices and conditions,—even though they amount to practical confiscation of tens or hundreds of thousands of dollars invested in plant and good will,—if its conditions, whatever they be, do not suit the party desiring continued water power, he need not "treat." What investments have been made on the faith of a continuous supply of water at reasonable rates and on reasonable terms, and what ruin may ensue from disregarding them are not matters that concern this company. It ignores the fact that it is the custodian of a double franchise, and amenable to the courts and the law for the use of them both. It ignores the fact that the right to dam up the waters of the largest river in the State and let to farm the power thereby made available, is in itself a franchise, and as such must be reasonably administered. It ignores the fact that its very existence is a franchise granted by the sovereign, and that it is bound to exercise

every power it possesses in a reasonable manner; that, as a matter of law and fact, it has *no* "unrestricted right." All these this company has put behind it as unworthy to be considered. The claims that it is here asserting are contrary to the fundamental law of the land. At the least, they demonstrate the necessity there was that the legislature should restrict the capacity of the company, and the wisdom of doing so, to the extent for which we contend.

An affirmance of the circuit court of the city of Richmond will be claimed by the appellees to be an adjudication of their claims in the broadest language in which they are made. It may, therefore, even give trouble that lessees would not otherwise have had in protecting themselves under the general common law against unreasonable exactions. While that general common law affords a theoretical remedy, its practical application is a matter of exceeding great difficulty. In this case the legislature has, we think, established a rule simple to be understood, easy to be applied. Every "existing contract" at the owner's option is perpetuated as to its conditions and at rates that may be agreed on, "not exceeding the present rates." The claims set up by the appellees show the wisdom as well as the necessity for the protection thus afforded.

On page 31: There is no *hardship* on the company involved in our contention. They may realize a less income from water rents than if they were permitted to charge "all the business will bear," which is the railroad rule. But this would be more than made up in *freights* furnished by prosperous manufacturing establishments. A sound policy would seem to indicate what the canal company did to be wise. A departure from it suggests some other motive than mere increase of income. They suggest the burden of keeping up these levels. It is trifling. But if it was as great as it is actually small, one sufficient reply is, "Those are the terms on which you were permitted to

get all this property," and you accepted them.   There may be other mills where the rents are not equal to the expense. Be it so.   The act is fair, and protects the company as well as the citizen.   You may "cancel them by agreement, or extinguish them by condemnation."   The legislature intended that the owners should not be slaughtered; that existing and developed interests should be maintained.   If their sacrifice is necessary to the company for the public good, the company can condemn them, paying "just compensation."   If not *necessary*, but expedient to prevent a constant expense, if they cannot be condemned, they can be "cancelled by agreement," if the company chooses to buy them up.   But it was not contemplated that either of these things would occur at Richmond and Lynchburg.   At those points the company is perpetually to keep the levels open, the supply of water the same as it then was, and is forbidden to obstruct or diminish it.

### Conclusion.

We think that we have established each of these propositions:

1. That the unexpired fragments of current leases needed no protection at the hands of the legislature.

2. That ample protection is given these unexpired fragments by section 1, clause 1.

3. That it cannot be maintained that the language of both the first clause and the sixth clause of the first section relates to the fragments of current contracts, because that would be to make the same thing enter twice as a part of the consideration.

4. That the owners of investments in manufacturing enterprises needed sorely protection after the expiration of their current leases.

5. That under all the circumstances surrounding the

existence of the James River and Kanawha Company, and the transfer of its property, rights and franchises to the Richmond and Alleghany Railroad Company, it was eminently reasonable that protection should be given owners of investments in manufacturing industries *after* the expiration of their current leases.

6. That the legislature did protect these persons and their property by providing in the sixth clause what would take the place of a covenant to renew perpetually, at the lessees option, subject to a variation of rates, the current rates being established as a perpetual maximum.

(*a*) Because that construction alone gives some effect to every word of the clause.

(*b*) Because the fragments of leases needing no protection, the language, sought by the appellees to be applied to them, is useless and tautologous, when thus restricted, *i. e.*, receives no effect.

(*c*) Because so insignificant a thing as a three-years fragment of a fifteen-year lease, is not of a character to be part of the consideration for the enormous values passing, and to so include it would be out of keeping with everything surrounding the transaction.

(*d*) Because there is no other duty, obligation or proviso in the enabling act, proper and capable of being made perpetual, that is not erected into a perpetuity and no valid distinction can be drawn, or sufficient reason assigned, for making this an exception.

(*e*) Because all the facts surrounding the transaction show that the legislature was striving to secure as large a return, either as conditions or as consideration, as it could for the great values passing, and being unable to realize a pecuniary price, stipulated for benefits for as great a number of citizens as possible, and to last as long as possible, so as, if possible, not to leave anybody worse off than if the James River and Kanawha Company had continued perpetually.

(*f*) Because our construction is consistent with everything in the act and deed, while that sought to be imposed by the appellees practically nullifies five-sevenths of the sixth clause.

(*g*) Because the construction sought to be established by the appellees would, under the claims put forward, give to this company and its successors powers contrary to the fundamental principles of jurisprudence, and such an intent is not to be imputed to the legislature, if there be any other reasonable construction that may be given.

We therefore ask that the decree of the circuit court of the city of Richmond be reversed and annulled, and that this court enter such decree as that court ought to have entered, and establish the rights of the appellants as claimed.

*W. W. Gordon, Christian & Christian, Kirkpatrick & Blackford,* and *Johnston, Williams & Boulware,* for the appellees.

LEWIS, P., delivered the opinion of the court.

This is a controversy between the appellants and the receivers of the Richmond and Alleghany Railroad Company. The former are the owners and operators of an extensive flouring mill in the city of Lynchburg, situate on what is known as "the Lynchburg level." And for a number of years they were lessees of certain water privileges, for the operation of their mill, from the James River and Kanawha Canal Company. On the first of October, 1876, they entered into a new lease with the canal company for a water supply, at a stipulated and established rate, which by its terms was to continue until the first of July, 1883.

On the fourth of March, 1880, the property and franchises of the James River and Kanawha Company were

sold and conveyed to the Richmond and Alleghany Railroad Company, pursuant to authority conferred by the act of assembly, approved February 27, 1879. (Acts 1878-79, p. 118 *et seq.*)   And by a decree of the court below, entered in the suit of Bocock and Green, trustees, against The Richmond and Alleghany Railroad Company, in June, 1883, the property, franchises, etc., of the last mentioned company were placed in the hands of the above mentioned receivers, who have since operated the road under the control of the court.

After the expiration of their lease above mentioned, the appellants were notified by the said receivers of their resolution to charge thereafter increased rates for the water privileges theretofore leased by the appellants, whereupon the latter denied the right of the receivers to do so; and to settle the question in dispute, a petition was filed in the court below by the receivers, to which the appellants and others in like case with them were made defendants.   The circuit court decided in favor of the receivers, whereupon this appeal was taken.

The case turns upon the true construction of the sixth clause of the first section of the act above mentioned, which is as follows:

"Sixth. It is hereby provided that the rate of dockage at Richmond shall not exceed the rate at present established by the James River and Kanawha Company, and all existing contracts for water privileges along the entire line shall be respected and maintained at rates not exceeding the present rates, except in those cases in which they may be cancelled or altered by agreement, or extinguished by condemnation.   It shall be the duty of the Richmond and Alleghany Railroad Company to maintain the present water supply of the docks, and of the canal, along its line, between Bosher's dam and tide-water, and along the Lynchburg level between the water-works dam (which

shall be preserved) above Lynchburg; and in the construc-
tion of its railroad it shall not so destroy or obstruct the
present canal between Bosher's dam and tide-water, or
between the water-works dam above Lynchburg and the
first lock below Lynchburg, as to lessen the present supply
of water."

The claim of the appellants is, that these provisions of
the statute make perpe´tual, at the option of the lessees, all
contracts for water privileges in existence at the time the
statute was passed. And in support of this view an elabo-
rate argument has been submitted, much of which, had it
been addressed to the legislature when the act was under
consideration by that body, would doubtless have had
great weight, but which loses its force when addressed to
us, whose province it is simply to construe the statute as
it was passed.

The decree is clearly right. The language in question is
plain and unambiguous, and we have neither power to
change it, nor a doubt as to its construction. It is not
enacted that all existing water privileges shall be contin-
ued as they are; but that "all existing contracts for water
privileges * * shall be respected and maintained at rates
not exceeding the present rates," which means contracts
executed, and binding on both sides, not future contracts,
and still less contracts to be indefinitely continued at the
option of the lessees. The evident purpose of the legisla-
ture was, by special enactment, to protect existing con-
tracts for water privileges which had been entered into
with the canal company, but not, in doing so, to impose
upon the railroad company, as its successor, greater obliga-
tions in respect thereto than the canal company had
assumed. Therefore, such contracts, which by their terms
were not renewable as against the canal company, became
none the more so as against the railroad company. In

other words, they were not affected by the transfer of the property and franchises of the canal company to the railroad company.   It is true that such contracts were already protected against impairment by both State and federal law, but that cannot change the language of the statute, or extend its operation to matters not embraced within its terms.

In respect to dockage at Richmond, the language is explicit, that the rate shall not exceed the rate established by the James River and Kanawha Company, at the date of, the passage of the act.   But the language, immediately following, in respect to water rates, is different.   These the company is not forbidden to increase, except only where to do so would violate *"existing* contracts."   This difference in phraseology is significant, and shows that the legislature intended to leave the matter of water rates a subject of contract between the parties, after then "existing contracts" had expired.

Nor is the case affected by the provision requiring the railroad company to maintain its water supply at Richmond and at Lynchburg.   The provision was undoubtedly inserted in the interest of the manufacturing establishments in and near those cities, which were dependent for their water supply on the canal company; but this requirement is a very different thing from requiring the company to furnish water for all time to come, if the lessees choose to continue to take it, at rates not exceeding those charged at the time the act took effect.   In short, as was well said by counsel for appellees, to reverse the decree would be to hold, in effect, that the statute not only requires existing contracts to be respected and maintained, but imposes an obligation on one side only to make other and additional contracts, which did not exist, which the canal company was not bound to make, which the water-taker may at his

pleasure refuse to make, and the terms of which, even on the appellants' own construction of the statute, are wholly undefined, save only as to the maximum of rates which may be charged. The decree is affirmed.

DECREE AFFIRMED.